IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 05-0272
════════════
 
Entergy Gulf States, Inc., 
Petitioner,
 
v.
 
John Summers, 
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Ninth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued October 16, 
2008
 
 
            
Justice 
Hecht, concurring.
 
 
            
I think the Court’s construction of the statutory text is reasonable, but 
so is the dissent’s (though I disagree with much of its analysis), which means 
that the provisions are ambiguous and can be understood correctly only in the 
context of the Texas Workers’ Compensation Act as a whole. I join in all but 
Part VII of the Court’s opinion and write separately to explain my reasons for 
doing so, which come down to this: the Act encourages coverage, as does the 
Court’s construction, but the dissent’s does not.
I
            
Ascertaining the meaning of a statutory text (or any text for that 
matter) begins with the language used, and if that language is plain enough, 
absent some obvious error or an absurd result, that is where the task ends.[1] It matters not what someone thinks the 
text may have meant to say or now hopes or wishes it said.[2] To look beyond the 
plain language risks usurping authorship in the name of interpretation. 
Construing statutes is the judiciary’s prerogative; enacting them is the 
Legislature’s. To prevent trespass, this Court and others have repeatedly 
stressed that statutory construction must be faithful 
to the plain language of the text.
            
But that principle is undermined when it is invoked where it does not 
apply — that is, when the language of the text is not, in fact, plain. To find 
plain meaning where it is missing suggests at best that the investigation is 
insincere or incompetent, at worst that the search is rigged, that the outcome, 
whatever it is, will always come out to be “plain”. Fidelity to plain meaning is 
important only if the word “plain” has itself a plain meaning.
            
I fear the phrase “plain language” has been overworked to the point of 
exhaustion. It has appeared in published Texas cases more often in the past decade than 
in the prior fifteen,[3] usually as the basis for resolving a 
dispute over meaning, though it can hardly be said that the prevalence of plain 
language is increasing, let alone exponentially. I detect no waning in the power 
of the curse at Babel. To the contrary, more and more this 
Court is called upon to construe statutes which opposing parties insist are 
unambiguous and mean very different things. A dispute over meaning does not 
render a text ambiguous;[4] many disputes lack substance. But when 
language is subject to more than one reasonable interpretation, it is 
ambiguous.[5] That is the plain meaning of ambiguous. 
Of course, reasonable people “will sometimes disagree about what reasonable 
people can disagree about”,[6] but even so, it is difficult to maintain 
that language is plain in the face of a substantial, legitimate dispute over its 
meaning.[7]
            
Only every so often do we come right out and brand a text with the 
a-word,[8] as if it were a mark of shame. It seems 
nicer to call a statute unclear[9] or better yet, just leave that 
implication.[10] But the truth is that the meaning of 
statutory language is often reasonably disputed and therefore ambiguous to some 
extent, and resolving reasonable disputes with reason, rather than by denying 
their reasonableness, would result in a sounder jurisprudence. Two great evils 
attend this course. One is that judges will use analysis of reasonable 
disagreements over meaning as a guise for substituting their own preferences in 
place of the legislature’s. This would trespass upon 
the boundary between judicial and legislative spheres that 
is fundamental to our structure of government. The other is that in the 
search for the meaning of a statutory provision, courts will grasp at all sorts 
of statements made before, during, and after the process of enactment, whether 
by legislators or others, as relevant or even authoritative. The Legislature 
does not speak through individuals — even its members — in committee hearings, 
in bill analyses and reports, in legislative debate, or in pre- and 
post-enactment commentary; it speaks through its enactments.
            
Rather than struggle to understand and explain a difficult text, it might 
seem easier to fall back on a simple insistence that all language have a plain 
meaning, but doing so risks leaving the impression that the court is not being 
entirely honest. Courts must scrupulously guard against both evils, but in doing 
so, cannot ignore a statute’s context that may illumine its meaning. Years ago 
Special Chief Justice Samuels[11] wrote for this Court:
 
            
A statute should not be construed in a spirit of detachment as if it were 
a protoplasm floating around in space. The historical 
treatment to which a statute may be subjected is aptly set forth in Travelers’ 
Insurance Co. v. Marshall, 124 Tex. 45, 76 S.W.2d 1007, 1012 . . . [1934], where 
it is said: ‘Generally it may be said that in determining the meaning, intent, 
and purpose of a law or constitutional provision, the history of the times out 
of which it grew, and to which it may be rationally supposed to bear some direct 
relationship, the evils intended to be remedied, and the good to be 
accomplished, are proper subjects of inquiry.’[12]
 
II
            
The Workers’ Compensation Act provides that a general contractor who 
agrees to furnish workers’ compensation insurance coverage to a subcontractor 
and its employees becomes their employer for purposes of the Act — their 
statutory employer, if you will — so that their exclusive remedy against the 
general contractor for on-the-job injuries is compensation benefits. 
Specifically, the relevant provisions of the Labor Code state:
 
A general contractor and a subcontractor may enter into a 
written agreement under which the general contractor provides workers’ 
compensation insurance coverage to the subcontractor and the employees of the 
subcontractor.[13]
 
“General contractor” means a person who undertakes to procure 
the performance of work or a service, either separately or through the use of 
subcontractors. The term includes a “principal contractor,” “original 
contractor,” “prime contractor,” or other analogous term. The term does not 
include a motor carrier that provides a transportation service through the use 
of an owner operator.[14]
 
“Subcontractor” means a person who contracts with a general 
contractor to perform all or part of the work or services that the general 
contractor has undertaken to perform.[15]
 
An agreement under this section makes the general contractor 
the employer of the subcontractor and the subcontractor’s employees only for 
purposes of the workers’ compensation laws of this state.[16]
 
Recovery of workers’ compensation benefits is the exclusive 
remedy of an employee covered by workers’ compensation insurance coverage or a 
legal beneficiary against the employer or an agent or employee of the employer 
for the death of or a work-related injury sustained by the employee.[17]
 
            
The question is whether a person who subcontracts work to be done on his 
own property is a general contractor for purposes of these provisions. In the 
Court’s first opinion, we all thought from the “plain and ordinary meaning” of 
the provisions the answer was clearly yes.[18] On rehearing, after reargument and a number of amicus briefs, three Members of the Court now disagree and 
think that the statutory language “seems clear”[19] and “compels the conclusion”[20] that the answer is no. The difficulty is 
this: while it is true, as the Court contends, that a person who engages 
subcontractors to work on his own property is often said to act as his own 
general contractor and certainly performs that function, more often, as the 
dissent contends, a general contractor is thought of as a person who works for 
someone else, like a property owner, subcontracting parts of a job to others as 
appropriate. On the face of it, either reading of the statute seems reasonable. 
The text, it must therefore be said, is ambiguous.
            
Scrutinizing the text does not resolve the difficulty. The statutory 
definition of “general contractor” has three components. The first is this 
prescription: “‘General contractor’ means a person who undertakes to procure the 
performance of work or a service, either separately or through the use of 
subcontractors.” A premises owner who undertakes to procure the performance of 
work or service on his property would appear to fit this definition of general 
contractor. A premises owner can undertake to procure work or service for 
himself, through subcontractors for example, or he may employ someone else to 
procure the work or service — the subcontractors — for him. Nothing in the 
statute’s use of the word “undertakes” suggests any difference in its ordinary 
meaning.
            
The second component of the statutory definition is a non-exclusive list 
of examples: “The term includes a ‘principal contractor,’ ‘original contractor,’ 
‘prime contractor,’ or other analogous term.” The dissent asserts that “we have 
for decades defined a contractor as ‘any person who, in the pursuit of an 
independent business, undertakes to do a specific piece of work for other 
persons . . . .’”, quoting a 1942 decision of this Court, Industrial 
Indemnity Exchange v. Southard,[21] which in turn quoted a 1924 decision of 
the commission of appeals, Shannon v. Western Indemnity Co.[22] But the issue in Southard was 
whether the claimant was an independent contractor, and the quoted 
passage addresses that issue, as is clear from its context:
 
Many definitions of what is meant by the term ‘independent 
contractor’ have been given. They all rest substantially on the same basic 
principle. In the case of Shannon v. Western Indemnity Co., Tex. Com. App., 257 
S.W. 522, 524, this Court announced, as the basis for the opinion rendered in 
that case, the following definition: ‘A contractor is any person who, in the 
pursuit of an independent business, undertakes to do a specific piece of work 
for other persons, using his own means and methods, without submitting himself 
to their control in respect to all its details.’[23]
 
The issue was 
the same in Shannon, a case decided by 
the commission of appeals. Certainly, a person could not act as his own 
independent contractor; his independence would be severely compromised. But 
nothing in either case suggests that an owner cannot act as his own general 
contractor. The dissent points out correctly that the Legislature has sometimes 
used “general contractor” in a way that excludes a premises owner.[24] But the Court cites instances in which a 
person who hires subcontractors directly is said to act as his own general 
contractor, suggesting that it is a common expression.[25] One cannot be sure from the text alone 
whether the Legislature meant for owners to be, or not to be, general 
contractors.
            
The list of examples is specifically non-exclusive but obviously intended 
to illustrate similarities.[26] The dissent argues that a premises owner 
cannot be a general contractor because the 1979 edition of Black’s Law 
Dictionary defined a “contractor” as “a person who, in the pursuit of any 
independent business, undertakes to do a specific piece of work for other 
persons”.[27] But the rest of the definition is not so 
restrictive:
 
This term is strictly applicable to any person who enters into 
a contract, but is commonly reserved to designate one who, for a fixed price, 
undertakes to procure the performance of works or services on a large scale, or 
the furnishing of goods in large quantities, whether for the public or a company 
or individual. Such are generally classified as general contractors (responsible 
for the entire job) and subcontractors (responsible for only portion of job; 
e.g. plumber, carpenter).[28]
 
The 
definitions describe someone who might or might not be the owner of the jobsite. 
The same dictionary gives this definition of “general contractor”:
 
One who contracts for the construction of an entire building 
or project, rather than for a portion of the work. The 
general contractor hires subcontractors (e.g. plumbing, electrical, 
etc.), coordinates all work, and is responsible for payment to subcontractors. 
Also called “prime” contractor.[29]
 
It defines 
“prime contractor” thusly:
 
The party to a building contract who is charged with the total 
construction and who enters into sub-contracts for such work as electrical, 
plumbing, and the like. Also called “general 
contractor.”[30]
 
Neither of 
these definitions excludes a jobsite owner from acting as his own general 
contractor. Other dictionaries are similarly inconclusive.[31] The second component does not clearly 
indicate whether a jobsite owner is or is not to be treated as a general 
contractor.
            
The third component of the statutory definition is an 
exclusion: “The term does not include a motor carrier that provides a 
transportation service through the use of an owner operator.” The Court argues 
that expressing only one exclusion suggests that no 
others exist.[32] The dissent offers this tautological 
explanation of the exclusion: “the Legislature likely expressly excluded motor 
carriers from the general-contractor definition to make it clear that, even 
though they might otherwise fit the general-contractor construct, they are to be 
treated differently.”[33] I dare say that it was not merely likely 
but absolutely certain that by excluding motor carriers, the Legislature meant 
to make clear they are to be treated differently. But the dissent misses the 
Court’s point: if the Legislature intended to make clear who should not be 
treated as a general contractor, as we all think it did, and it listed motor 
carriers but not premises owners, then premises owners should be treated as 
general contractors.
            
The statutory definition of “subcontractor” — “a person who contracts 
with a general contractor to perform all or part of the work or services that 
the general contractor has undertaken to perform” — does not help clarify the 
matter. A premises owner may be a general contractor who “undertake[s] to 
perform” work by contracting with subcontractors.
            
Examined with precision, the statutory text can reasonably be read to 
provide that a person who undertakes to procure work or service is no less a 
general contractor because he also happens to own the premises where the job is 
to be done, and no less a statutory employer when he provides workers’ 
compensation insurance coverage for subcontractors and their employees. That, of 
course, is why the Court was unanimous in its first opinion. The dissenters too 
quickly dismiss a position they so recently embraced unreservedly; sometimes 
wrong, they are never in doubt. But their basic argument has weight: general 
contractor often refers to someone who works for the job owner. This reading of 
the statute is a reasonable one, in my view, but it is not the only reasonable 
one.
III
            
The disagreement in this case is not over words and cannot be resolved 
with dictionaries. It is over consequences and can only be settled by examining 
how the statutory provisions fit in the context of the Workers’ Compensation Act 
as a whole. The issue for the Court is not whether it is good policy to treat a 
person who arranges for work to be done on his property as a general contractor, 
something we cannot decide, but whether such treatment is most consistent with 
the policies embedded in the Act. For four reasons, I believe it is.
            
First: The Act’s “decided bias” is for 
coverage.[34] Although employees and employers can opt 
out, an employee has only a limited time frame in which to do so,[35] and an employer is penalized for doing 
so by loss of his common law defenses to an employee’s claim of injury.[36] The Act’s encouragement of coverage is 
furthered by incentivizing general contractors to 
provide workers’ compensation coverage for subcontractors and their employees.[37] No one questions that the Act does this 
by providing such general contractors the protection of the exclusive remedy. To 
refuse the incentive when the general contractor happens to own the jobsite 
would discourage coverage, contrary to the policy of the Act. The dissent 
responds that because the Act is in derogation of common law rights, it should 
not be “applied to cases not clearly within its purview”.[38] But it has long been “the settled policy 
of this State to construe liberally the provisions of the [Act] in order to 
effectuate the purposes for which it was enacted.”[39] Coverage is a fundamental purpose of the 
Act.
            
Second: Since 1917, the Act has expressly prohibited a subscriber 
from using a subcontractor to circumvent coverage.[40] To prohibit a subscriber who owns the 
jobsite from engaging subcontractors to avoid paying compensation benefits, 
while at the same time discouraging the subscriber from providing compensation 
benefits by denying the exclusive remedy protection, would be a perverse result 
indeed. The dissent dismisses the policy of discouraging avoidance of coverage, 
contained in the Act since 1917, as “irrelevant”,[41] but there is simply no reason to think 
that the Act has ever beckoned with one hand and shunned with the other.
            
Third: Since 1963, the Act has provided that a subscribing 
employer may agree in writing, before a worker has been injured, to assume a 
third party’s liability for the injury.[42] Such agreements appear to be common 
among contractors on construction jobsites.[43] If the employer is a subcontractor and 
the third party is a general contractor who has provided coverage for the 
worker, the worker’s exclusive remedy against both is limited to compensation 
benefits. If the general contractor were not afforded the same protection 
because he owned the jobsite, the worker could recover common law damages 
against him, and he in turn could require the subcontractor to assume the 
liability, thereby defeating the protection of the exclusive remedy to the 
worker’s own employer, even though he and the general contractor both provided 
compensation benefits. In this case, Entergy had just such an indemnity 
agreement with IMC.[44] If Summers can 
recover common law damages from Entergy (having already received compensation 
benefits, of course), Entergy can require reimbursement by IMC, Summers’ direct 
employer. In this situation, the workers’ compensation system provides nothing 
to any employer, even though all employers have agreed to provide compensation 
benefits to all employees, which the injured worker himself requested and 
received. This would be an even more perverse disruption of the policies of the 
Act. The dissent argues that the economic effect of indemnity agreements is 
minimal because an employer can obtain compensation coverage at a reduced cost 
through owner-provided policies like Entergy’s and can buy general liability 
insurance for the increased risk of damages not limited by providing 
compensation coverage. But compensation insurance that provides no protection is 
no bargain, however reduced the cost, and having to buy 
two policies for an increased risk when one policy for a limited risk should do 
is perverse. The fact that employers often do so, the dissent says, shows they 
know they must, but all it shows for sure is an unwillingness to put too much 
trust in the fairness of the law. Anyway, according to the dissent, the problem 
is “a policy choice the Legislature made.”[45] I would not blame the Legislature for a 
problem that can be avoided by a reasonable construction of the Act.
            
Fourth: The Act creates a comprehensive system,[46] and treating similarly situated 
contractors and employers differently would disrupt that system unnecessarily. 
There is no apparent reason why a premises owner should have the exclusive 
remedy protection when he provides workers’ compensation insurance covering his 
own employees engaged in particular work but not when he provides the same 
coverage for his subcontractors and their employees, retained to do the same 
work.[47] The dissent’s only response is that 
whimsy is a legislative prerogative.
            
The Act, first passed in 1913, provides an injured worker guaranteed but 
limited wage and medical benefits quickly and without regard to fault, in 
exchange for which the worker foregoes common law damage claims against his 
employer.[48] Not long ago, we wrote: “The [A]ct, 
which was part of a nationwide compensation movement, was perceived to be in the 
best interests of both employers and employees.”[49] Much earlier, we said:
 
            
Workmen’s compensation laws have become part of our public policy. The 
object of the laws was to do away with the issues of negligence, unavoidable 
accident, assumed risk, contributory negligence, and other like issues, and to 
fix the amount recoverable free of any uncertainty. The old system of settling 
disputes was unsatisfactory, and modern business methods demanded that 
compensation for injuries to employees be not controlled by the fault or 
negligence of the employee, but should rest upon broader, more humane, and more 
certain rules.[50]
 
            
An owner-run jobsite is not uncommon. No one has suggested a reason why a 
general contractor who works for an owner can submit to the obligations and 
protections of the workers’ compensation system as a statutory employer for all 
the workers on the job, while the owner himself cannot, other than to subvert 
the system. Of course, the Legislature needs no reason to differentiate between 
general contractors who do not own the jobsite and those who do. But we are 
required to presume that the Legislature has acted reasonably,[51] and in any event, the statutory 
provisions at issue draw no such distinction. While their silence on the subject 
may be read either way, we should assume that the Legislature intended that the 
treatment of general contractors be consistent with the Act as a whole. For 
these reasons, I conclude that of the two constructions of the statutory text, 
both reasonable on their face, the Court’s is stronger.
IV
            
The argument is made, however, that the Legislature is not likely to have 
intended by its definition of “general contractor” to include a person who has 
work done on his own property because that would have been a major change in the 
law that would have drawn attention when in fact it was enacted without note. 
The Court followed the same line of reasoning in Energy Services Co. of 
Bowie, Inc. v. Superior Snubbing Services, Inc.,[52] where we construed an amendment to the 
statute governing the enforceability of indemnity agreements long used in the 
oil patch. The industry practice was well-settled, had never been criticized, 
and continued unchanged after the amendment. We concluded that “[a]bsent any identifiable reason for a substantive change to 
have been made in the statutory provision, or any extra-textual indication that 
one was intended, or any resulting change in industry practice, we think the 
most reasonable construction of [the amended statute] is the same as its . . . 
predecessors.”[53] The problem with the argument in this 
case is that it has never been clear when a person is considered the statutory 
employer of a subcontractor or his employees, liable to provide the workers’ 
compensation benefits, and entitled to the exclusive remedy protection of the 
Act.
            
Before 1983, the only provision in the Workers’ Compensation Act relating 
to coverage of a subcontractor was article 8307, section 6, which, as noted 
above, was enacted in 1917 and prohibited a subscriber from subcontracting work 
“with the purpose and intention” of avoiding the liability for workers’ 
compensation benefits he would have if his own employees were injured doing the 
work.[54] In that situation, the subcontractor’s 
injured employee was deemed to be the subscriber’s employee and therefore 
entitled to compensation benefits.
            
In three consecutive legislative sessions beginning in 1977, six bills 
were introduced, the ostensible purpose of which was to eliminate section 6’s 
subjective “purpose and intention” trigger and provide greater certainty in 
determining whether a subscriber should be treated as the statutory employer of 
his subcontractors and their employees. The premise of the bills was that 
subscribers were being treated as statutory employers already, but not always 
predictably or consistently. The bills proposed to amend or replace section 6 
and provide, variously, either that coverage extended to subcontractors unless 
otherwise agreed, that coverage did not extend unless otherwise agreed, or 
something in between. In brief:
 
•           
HB 1584, introduced in 1977, would have amended section 6 and provided simply 
that “under a bona fide sub-contract made in good faith”, workers’ compensation coverage was not provided.[55] HB 1584 passed the House[56] but was left pending in the Senate 
committee.
 
•           
HB 1585, also introduced in 1977, would have replaced section 6 altogether and 
provided that a subscriber’s coverage extended to subcontractors and their 
employees, absent an agreement to the contrary, unless they were already 
covered.[57] HB 1585 would also have provided that a 
subscriber could always agree to extend compensation coverage to a subcontractor 
and his employees and pass the cost through to the subcontractor.[58] HB 1585 was not voted out of 
committee.
 
•           
In 1979, SB 360 was introduced, almost identical to HB 1584, but it was 
rewritten in committee and passed the Senate. The committee substitute deleted 
existing section 6 and provided instead that a prime contractor would not be 
deemed the employer of a subcontractor or his employees without an agreement 
beforehand, but absent such an agreement, the prime contractor would be required 
to provide coverage if the subcontractor did not do so, and could pass the cost 
through to the subcontractor.[59] The House committee amended the bill, 
reverting to a version something like HB 1584, providing that a general 
contractor could not be deemed to employ a subcontractor or his employees 
without agreeing at the outset of the job to provide workers’ compensation 
benefits to the subcontractor and his employees.[60] The cost could be passed through to the 
subcontractor. The committee substitute was tabled on the floor.
 
•           
In 1981, three bills were introduced, SB 629, HB 1662, and SB 1080, all 
essentially identical to the House committee substitute for SB 360 the prior 
session. None made it to the floor.
 
            
None of these bills defined a general contractor or distinguished between 
one who owned the jobsite and one who worked for the owner. All seemed to treat 
any subscriber who engaged a subcontractor as a general contractor, though none 
specifically said so. Nothing in any of the bills suggested that a subscriber 
who engaged a subcontractor either could not or should not be allowed to extend 
coverage to a subcontractor and his employees and thereby become their statutory 
employer, with the benefit of the exclusive remedy protection.
            
In 1983, HB 1852 as introduced, like the bills the prior session, would 
have deleted existing section 6 and provided that a prime contractor’s workers’ 
compensation insurance coverage would not extend to a subcontractor or his 
employees except by agreement.[61] But the bill was amended in the House 
and Senate to restore existing section 6, redesignated 
6(d), delete the sentence precluding a prime contractor from being deemed the 
statutory employer of a subcontractor and his employees, and provide that a 
prime contractor could agree to extend coverage to a subcontractor and his 
employees, passing the cost through to the subcontractor. As thus amended, the 
bill was enacted. The new section 6 had four paragraphs. Section 6(d) retained 
the 1917 text of section 6, providing that any subscriber who tried to avoid 
covering a subcontractor’s employees would be deemed to be their employer for 
compensation purposes.[62] Section 6(a) expressly recognized that a 
prime contractor could agree to extend coverage to a subcontractor and his 
employees.[63] Section 6(c) defined “prime contractor” 
for the first time as follows:
 
The term “prime contractor” includes “principal contractor,” 
“original contractor,” or “general contractor” as those terms are commonly used 
and means the person who has undertaken to procure the performance of work or 
services. The prime contractor may engage subcontractors to perform all or any 
part of the work or services.[64]
 
And section 
6(b) defined “subcontractor” to mean “a person who has contracted to perform all 
or any part of the work or services which a prime contractor has contracted with 
another party to perform.”[65]
            
By referring to a prime contractor as someone who works for another, the 
definition of “subcontractor” would exclude an owner. But if the meaning of 
“prime contractor” defined in section 6(c) is to be informed by the definition 
of “subcontractor” in section 6(b), it must also be informed by section 6(d), 
which refers to the person who engages a subcontractor as a subscriber, a term 
that includes an owner acting as his own general contractor. Section 6(d) 
applies to all subscribers. If sections 6(a)-(c) were read to address only the 
situation in which the subscriber and prime contractor is not the owner, no 
ambiguity in the meaning of “prime contractor” would exist. Section 6(d) would 
have general application, while the other sections would not. The effect of HB 
1852 was to provide greater certainty in one area, even if a comprehensive 
solution remained beyond reach. But if sections 6(a)-(c) were also of general 
application and prescribed the requirements for considering any prime contractor 
to be the statutory employer of subcontractors and their employees, then the 
ambiguity in the meaning of “prime contractor” would be unavoidable. Moreover, 
that construction of the statute would raise the question why a prime contractor 
who owns the jobsite should, like all other prime contractors, be prohibited 
from trying to avoid liability for workers’ compensation benefits, but unlike 
all other prime contractors, not be allowed to provide such benefits.
            
In any event, the law regarding statutory employers was not clear before 
1983, as evidenced by the variety of efforts to clarify it, and it was not much 
clearer after 1983.[66] HB 1852, as introduced, amended, and 
finally enacted, like the six bills in the prior three sessions, never suggested 
that statutory authorization previously lacking was required for prime 
contractors to extend workers’ compensation coverage to subcontractors and their 
employees. On the contrary, the one consistent theme in all the bills was the 
need to clarify when coverage was extended, not whether it could 
be. HB 1852, like the others, never attempted to distinguish premises owners 
from prime contractors, and the definition of “prime contractor” finally enacted 
could reasonably be read to include a premises owner acting as his own general 
contractor.
            
I do not mean to suggest for a moment that the drafting history of the 
1983 statute is relevant in determining the Legislature’s intent by enacting it. 
The various bills and amendments do not reveal even the sponsors intentions, let 
alone the Legislature’s. But the history of the legislation does effectively 
rebut the argument that the law regarding the extension of workers’ compensation 
coverage to subcontractors and their employees was clear in 1983, and that 
allowing a person to be the statutory employer of subcontractors working on his 
property was so significant a change in 1989 that it would not have occurred 
without comment. The history of the legislation clearly shows that existing law 
was at all times unclear.
            
Thus, the argument that the 1989 change in the definition of 
“subcontractor” was not substantive because it was made without comment could be 
correct, but it is not clear what the law was before the change. The 1983 
definition referred to “work or services which a prime contractor has contracted 
with another party to perform”. The 1989 definition referred to “work or 
services which a prime contractor has undertaken to perform”. The dissent argues 
that the Legislature used “undertaken” to mean the same thing as “contracted 
with another party”, but it is just as likely that the Legislature used 
“undertaken” because it was more accurate and removed an ambiguity in the 1983 
statute. The point is that the argument that the 1989 change was not substantive 
because it was not controversial proves nothing because the backdrop against 
which it appeared was itself unclear.
            
Finally, a number of bills introduced between 1995 and 2005 would have 
clarified who is a statutory employer on construction jobsites.[67] The Court explains why failed bills are 
not indicative of legislative intent. I would also point out that the fact that 
six bills failed in three sessions before 1983 did not indicate a legislative 
intent that HB 1852 not be the law.
* * *
            
Respondent and the amici curiae that support 
his position argue that the statutory construction urged by petitioner is bad 
policy. We have no way to judge such matters and do not do so. Underlying many 
of their arguments is a conviction that the workers’ compensation system is 
basically unfair. That issue also is not ours to judge. We must presume that the 
system is just and reasonable.[68] The Court’s construction of the 
statutory provisions at issue is most consistent with that system.
 
            
            
            
            
            
            
            
____________________________________
            
            
            
            
            
            
            
Nathan L. Hecht
            
            
            
            
            
            
            
Justice
 
 
Opinion delivered: April 3, 
2009






[1] 
Simmons v. Arnim, 220 S.W. 66, 70 (Tex. 1920) (“Courts must 
take statutes as they find them. More than that, they should be willing to take 
them as they find them. They should search out carefully the intendment of a 
statute, giving full effect to all of its terms. But they must find its intent 
in its language, and not elsewhere. They are not the law-making body. They are 
not responsible for omissions in legislation. They are responsible for a true 
and fair interpretation of the written law. It must be an interpretation which 
expresses only the will of the makers of the law, not forced nor strained, but 
simply such as the words of the law in their plain sense fairly sanction and 
will clearly sustain.”), quoted in St. Luke’s Episcopal Hosp. v. Agbor, 952 S.W.2d 503, 505 (Tex. 1997), RepublicBank Dallas, N.A. v. Interkal, Inc., 691 S.W.2d 605, 607 (Tex. 1985), and 
Texas Highway Comm’n v. El Paso Bldg. & Constr. Trades Council, 234 S.W.2d 857, 863 (Tex. 1950); 
Fleming Foods of Texas, Inc. v. Rylander, 6 
S.W.3d 278, 284 (Tex. 1999) (“These specific, unambiguous statutes are the 
current law and should not be construed by a court to mean something other than 
the plain words say unless there is an obvious error such as a typographical one 
that resulted in the omission of a word, see City of Amarillo v. 
Martin, 971 S.W.2d 426, 428 n.1 (Tex. 1998), or application of the literal 
language of a legislative enactment would produce an absurd result, see 
id. (citing Bridgestone/Firestone, Inc. v. Glyn-Jones, 878 S.W.2d 132, 135 (Tex. 1994) (Hecht, J., 
concurring)).”).

[2] 
See Black v. Victoria Lloyds Ins. Co., 797 S.W.2d 20, 29 
(Tex. 1990) 
(Hecht, J., dissenting) (rejecting a “Cartesian theory” for construing insurance 
policies — “‘I believe, therefore I am insured’”).

[3] 
My Westlaw research reveals 1,501 cases in the past ten years, and 1,464 in the 
prior 153 years, an increase on average from less than ten cases a year to more 
than 100 cases a year. Not all are statutory construction cases, but plain 
language is important in other textual construction. I offer the results only as 
a very general indication of how the use of the phrase has multiplied.

[4] 
American Mfrs. Mut. Ins. Co. v. 
Schaefer, 124 S.W.3d 154, 157 (Tex. 2003); Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 465 (Tex. 
1998).

[5] 
In re Missouri Pac. R.R. Co., 998 S.W.2d 
212, 217 (Tex. 
1999) (“The language of the statute could support more than one reasonable 
interpretation and therefore is ambiguous.”).

[6] 
City of Keller v. Wilson, 168 S.W.3d 802, 828 (Tex. 2005).

[7] 
See, e.g., Quantum Chem. Corp. v. Toennies, 47 S.W.3d 473, 484 (Tex. 2001) (Hecht, J., 
dissenting) (“The Court touts its view as the ‘plain meaning’ of the 
‘unambiguous language’ of the statute. In other words, the split in the circuits 
is not really a serious dispute; the Second, Third, and Fourth Circuits simply 
cannot (or perhaps will not) read plain English.”).

[8] 
I recall four instances in the past twenty years. Tooke v. City of Mexia, 197 S.W.3d 325, 342 (Tex. 2006) (“[T]he words 
‘sue and be sued’, standing alone, are if anything, unclear and ambiguous.”); 
Wichita Falls State Hosp. v. Taylor, 106 S.W.3d 692, 701 (Tex. 2003) 
(“The statute’s ambiguity precludes our finding an unmistakable Legislative 
intent to waive sovereign immunity.”); In re Missouri Pac. R.R. Co., 998 
S.W.2d at 217; Stracener v. United Servs. Auto Ass’n, 777 S.W.2d 
378, 383 (Tex. 
1989) (“We find that this separation of the clause [with a comma] creates an 
ambiguity . . . .”).

[9] 
E.g., TXU Elec. Co. v. Pub. Util. Comm’n of 
Tex., 51 S.W.3d 275, 286 (Tex. 2001) (Owen, J., concurring and stating 
the opinion of the Court) (“We conclude . . . that the PURA is unclear . . . 
.”).

[10] E.g., City of Corpus Christi v. Pub. 
Util. Comm’n of Tex., 51 S.W.3d 231, 261 
(Tex. 2001) 
(Owen, J., concurring and stating the opinion of the Court) (“[W]hen faced with 
an ambiguous code provision, we give some deference to the Commission’s 
interpretation when it is reasonable . . . . Under the circumstances presented 
here, we cannot say that the Commission’s interpretation . . . is an 
unreasonable one . . . .”).

[11] Special Chief Justice Sidney L. Samuels of 
Fort Worth was 
designated by Governor Ross Sterling in January 1932 to sit for Chief Justice 
Cureton under a statute now codified as section 22.005 
of the Texas Government Code. The case involved a private claim against the 
State to lands in the once-disputed “Alsace-Lorraine” region along the 100th 
meridian from the Red River to the 36○ 30' parallel dividing Texas 
and the Indian territories that later became Oklahoma. The United States Supreme 
Court finally held in Oklahoma v. Texas, 272 U.S. 21 (1926), that the 
region belonged to Texas. Chief Justice Cureton was disqualified because he had represented 
Texas’ 
interests in the dispute. The Court took just nine years to decide the case. 
Interestingly, James V. Allred had also represented 
Texas’ 
interests while Attorney General, and when the case was decided, had served two 
terms as Governor and been nominated to serve as a federal judge, all the while 
being shown as counsel for the State in the case. (The most famous exercise of 
the designation power was surely Governor Pat Neff’s appointment of a Special 
Supreme Court consisting of three women, Mrs. Hortense 
Ward, Special Chief Justice, and Miss Ruth Virginia Brazzil and Miss Hattie L. Henenberg, Special Associate Justices, to hear and determine 
the issues in Johnson v. Darr, 272 S.W. 1098 (Tex. 1925).)

[12] Wortham 
v. Walker, 128 S.W.2d 1138, 1150 (Tex. 1939); see 
also Tex. Gov’t Code § 
311.023 (“In construing a statute, whether or not the statute is considered 
ambiguous on its face, a court may consider among other matters the: (1) object 
sought to be attained; (2) circumstances under which the statute was enacted; 
(3) legislative history; (4) common law or former statutory provisions, 
including laws on the same or similar subjects; (5) consequences of a particular 
construction; (6) administrative construction of the statute; and (7) title 
(caption), preamble, and emergency provision.”); id. § 312.005 (“In 
interpreting a statute, a court shall diligently attempt to ascertain 
legislative intent and shall consider at all times the old law, the evil, and 
the remedy.”).

[13] Tex. Lab. Code § 
406.123(a).

[14] Id. § 406.121(1).

[15] Id. § 406.121(5).

[16] Id. § 406.123(e).

[17] Id. § 408.001(a).

[18] 50 Tex. Sup. Ct. J. 1140, 1143 (Aug. 31, 2007) 
(“Construing the statute according to its plain and ordinary meaning, Entergy is 
a general contractor because it ‘[undertook] to procure the performance of work’ 
from IMC.” (brackets in original)).

[19] Post at ___.

[20] Post at ___.

[21] 160 S.W.2d 905, 907 (Tex. 1942).

[22] 257 S.W. 522, 524 (Tex. Comm’n App. 1924, judgm’t 
adopted).

[23] 160 S.W.2d at 
907.

[24] Post at ___.

[25] Ante at ___.

[26] See Hilco Elec. Coop. v. Midlothian Butane Gas 
Co., 111 S.W.3d 75, 81 (Tex. 2003) (“[T]he rule of ejusdem generis . . 
. provides that when words of a general nature are used in connection with the 
designation of particular objects or classes of persons or things, the meaning 
of the general words will be restricted to the particular 
designation.”).

[27] Black’s Law Dictionary 295 (5th ed. 
1979).

[28] Id.

[29] Id. at 615.

[30] Id. at 1072.

[31] Black’s Law Dictionary 350 (8th ed. 
2004) (“contractor. 1. A party to a contract. 2. More specif., one who contracts 
to do work or provide supplies for another.”); id. at 351 (“general contractor. One who contracts 
for the completion of an entire project, including purchasing all materials, 
hiring and paying subcontractors, and coordinating all the work. — Also termed original contractor; prime 
contractor.”); The Oxford English 
Dictionary 837 (2d ed. 1989) (“One who contracts or undertakes to supply 
certain articles, or to perform any work or service (esp. for government 
or other public body), at a certain price or rate; in the building and related 
trades, one who is prepared to undertake work by contract.”); Webster’s Third New International 
Dictionary 495 (1981) (“contractor . . . 1 a: one that 
contracts : a party to a bargain : one that formally undertakes to 
do something for another b: one that performs work (as a printing job) or 
provides supplies on a large scale (as to troops) according to a contractual 
agreement at a price predetermined by his own calculations c: one who 
contracts on predetermined terms to provide labor and materials and to be 
responsible for the performance of a construction job in accordance with 
established specifications or plans — called also building 
contractor”).

[32] Ante at ___.

[33] Post at ___.

[34] Wingfoot Enters. v. Alvarado, 111 S.W.3d 134, 
140 (Tex. 2003) (“And in examining the Labor Code’s overall scheme for workers’ 
compensation and for protecting workers, we conclude that the Act’s decided bias 
in favor of employers electing to provide coverage for their employees supports 
our conclusion that the Act permits more than one employer for workers’ 
compensation purposes.” (footnote omitted)).

[35] Tex. Lab. Code 
§ 406.034(b) (“An employee who desires to retain the common-law right of action 
to recover damages for personal injuries or death shall notify the employer in 
writing that the employee waives coverage under this subtitle and retains all 
rights of action under common law. The employee must notify the employer not 
later than the fifth day after the date on which the employee: (1) begins the 
employment; or (2) receives written notice from the employer that the employer 
has obtained workers' compensation insurance coverage if the employer is not a 
covered employer at the time of the employment but later obtains the 
coverage.”).

[36] Id. § 406.033(a) (“In an action 
against an employer who does not have workers’ compensation insurance coverage 
to recover damages for personal injuries or death sustained by an employee in 
the course and scope of the employment, it is not a defense that: (1) the 
employee was guilty of contributory negligence; (2) the employee assumed the 
risk of injury or death; or (3) the injury or death was caused by the negligence 
of a fellow employee.”); Kroger Co. v. Keng, 23 
S.W.3d 347, 349 (Tex. 2000) (“To encourage employers to obtain workers’ 
compensation insurance, section 406.033 penalizes nonsubscribers by precluding them from asserting certain 
common-law defenses in their employees’ personal-injury actions . . . .”). 
Still, about a third Texas employers choose not to subscribe to the 
workers’ compensation system. Biennial 
Report of the Texas Department of Insurance to the 81st Legislature – Division 
of Workers’ Compensation 3 (Dec. 2008).

[37] Wingfoot Enters., 111 S.W.3d at 142 (“[S]ection 406.123 (covering general contractors and 
subcontractors), like other workers’ compensation provisions in the Code, 
encourage[s] employers to obtain workers’ compensation insurance coverage by 
providing benefits to the employer, including the exclusive remedy provision, if 
coverage is obtained.”).

[38] Energy Serv. 
Co. of Bowie, Inc. v. Superior Snubbing Servs., 
Inc., 236 S.W.3d 190, 194 n.17 (Tex. 2007) 
(quoting Satterfield v. Satterfield, 448 S.W.2d 456, 459 (Tex. 1969)).

[39] Huffman v. S. Underwriters, 128 
S.W.2d 4, 6 (Tex. 1939) (quoted in In re Poly-America, L.P., 262 S.W.3d 337, 350 
(Tex. 2008)); 
see Millers’ Mut. Cas. Co. v. Hoover, 235 S.W. 863, 864 (Tex. Comm’n App. 1921, judgm’t adopted) 
(“It has been thought, inasmuch as the [Act] is in derogation of the common law, 
that it should be given a strict construction, but the courts have very 
generally held that a spirit of liberality should characterize its 
interpretations, for the reason that it is to be classed as remedial 
legislation.” (quotation omitted)); Southern Sur. 
Co. v. Inabnit, 1 S.W.2d 412, 413-414 (Tex. Civ. App.–Eastland 1927, no writ) (“The leading authorities 
. . . agree that Workmen’s Compensation Laws came into existence in response to 
a general acceptation of the broad economic theory that industrial accidents 
should properly be chargeable as a part of the overhead expenses of the 
industries. These laws are remedial in their nature, and should be liberally 
construed with the view of promoting their objects. The early tendency of our 
courts to construe them strictly because they were thought to be in derogation 
of common law has long since given place to a liberal rule of construction. The 
rule now prevailing prevents the restriction of the scope of the laws by 
exceptions and exact definitions not in harmony with their spirit.”).

[40] Act approved Mar. 28, 1917, 35th Leg., 
R.S., ch. 103, § 1, Part II, § 6, 1917 Tex. Gen. Laws 
269, 284-285 (“If any subscriber to this Act with the purpose and intention of 
avoiding any liability imposed by the terms of the Act sublets the whole or any 
part of the work to be performed or done by said subscriber to any 
sub-contractor, then in the event any employe[e] of 
such sub-contractor sustains an injury in the course of his employment he shall 
be deemed to be and taken for all purposes of this Act to be the employe[e] of the subscriber, and in addition thereto such 
employe[e] shall have an independent right of action 
against such sub-contractor, which shall in no way be affected by any 
compensation to be received by him under the terms and provisions of this 
Act.”); renumbered § 6(d) by Act of May 28, 1983, 68th Leg., R.S., ch. 950, 1983 Tex. Gen. Laws 5210, 5210-5211; amended by Act 
of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, § 
3.05(h), 1989 Tex. Gen. Laws 1, 16, formerly Tex. Rev. Civ. Stat. 
Ann. art. 8308, § 
3.05(h) (“If a person who has workers’ compensation insurance coverage 
subcontracts all or part of the work to be performed by the person to a 
subcontractor with the purpose and intent to avoid liability as an employer 
under this Act, an employee of the subcontractor who sustains a compensable 
injury in the course and scope of the employment shall be treated as an employee 
of the person for purposes of workers’ compensation and shall also have a 
separate right of action against the subcontractor, which right of action does 
not affect the employee’s right to compensation under this Act.”); codified by 
Act of May 12, 1993, 73rd Leg., R.S., ch. 269, § 1, 
1993 Tex. Gen. Laws 987, 1159, as Tex. 
Lab. Code § 406.124 (“If a person who has 
workers’ compensation insurance coverage subcontracts all or part of the work to 
be performed by the person to a subcontractor with the intent to avoid liability 
as an employer under this subtitle, an employee of the subcontractor who 
sustains a compensable injury in the course and scope of the employment shall be 
treated as an employee of the person for purposes of workers’ compensation and 
shall have a separate right of action against the subcontractor. The right of 
action against the subcontractor does not affect the employee’s right to 
compensation under this subtitle.”).

[41] Post at ___.

[42] Act of May 20, 1963, 58th Leg., R.S., ch. 437, § 1, 1963 Tex. Gen. Laws 1132, formerly Tex. Rev. Civ. Stat. 
Ann. art. 8306, § 3 
(1925); amended by Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch. 1, 1989 Tex. Gen. Laws 1, 32-33, formerly Tex. Rev. Civ. Stat. 
Ann. art. 8308-4.04; and 
codified by Act of May 12, 1993, 73rd Leg., R.S., ch. 
269, § 1, 1993 Tex. Gen. Laws 987, 1235, now Tex. Lab. Code 
§ 417.004 (“In an action for damages brought by an injured employee, a legal 
beneficiary, or an insurance carrier against a third party liable to pay damages 
for the injury or death under this chapter that results in a judgment against 
the third party or a settlement by the third party, the employer is not liable 
to the third party for reimbursement or damages based on the judgment or 
settlement unless the employer executed, before the injury or death occurred, a 
written agreement with the third party to assume the liability.”).

[43] Brief of Amicus Curiae ABC of Texas, Inc. 
at 5.

[44] The agreement between Entergy and IMC 
contained these provisions:
 
                
    “18.         
Indemnity
 
                
                
        
“18.1       To the fullest extent allowed by 
applicable law, the Contractor agrees that it will indemnify and hold harmless 
the Entergy Companies, their affiliated and associated companies and any of 
their agents, officers, directors, shareholders, employees, successors and 
assigns from any and all claims, losses, costs, damages, expenses, including 
attorneys fees, and liability by reason of property damage, personal injury 
(including death), or both such damage and injury of whatsoever nature or kind 
arising out of or as a result of any negligent or wrongful act or omission in 
connection with the performance of the Work by the Contractor, its employees, 
agents, and subcontractors. THE PARTIES EXPRESSLY AGREE THAT THIS INDEMNITY 
SHALL APPLY EVEN IN THE EVENT OF THE CONCURRENT NEGLIGENCE OF THE ENTERGY 
COMPANIES.
 
                
                
        
“18.2       Further, with respect to Contract 
Orders being performed by Contractor as an independent contractor with sole 
rights to direct the Work performed by its employees, the Contractor shall be 
solely responsible for and shall indemnify and hold harmless the Entergy 
Companies, their affiliated and associated companies and any of their agents, 
officers, directors, shareholders, employees, successors or assigns from and 
against any and all claims, liability, losses, costs, damages and expenses, 
including attorney fees, on account of the death of or injury to the Contractor 
or any subcontractors, or to any employees or agents of the Contractor or any 
subcontractor, caused by, arising out of, or in any way connected with the Work 
to be performed hereunder, or while the Contractor or any such subcontractors, 
employees or agents are on or near any of the Sites or Owners’ premises, 
WITHOUT REGARD TO WHETHER ANY SUCH DEATH OR INJURIES ARE ALLEGED TO HAVE BEEN 
CAUSED BY OR ARE ATTRIBUTABLE IN WHOLE OR IN PART TO THE NEGLIGENCE OF THE 
ENTERGY COMPANIES, THEIR EMPLOYEES OR AGENTS, THE CONDITIONS OF THE PREMISES, OR 
OTHERWISE, AND NOTWITHSTANDING ANY OTHER PROVISIONS HEREIN CONTAINED TO THE 
CONTRARY.”

[45] Post at ___.

[46] Woolsey v. Panhandle Ref. Co., 116 
S.W.2d 675, 676 (Tex. 1938) (“The law [the Workers’ 
Compensation Act] is comprehensive in its terms . . . .”)

[47] Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 795-796 (Tex. 
2001) (Hecht, J., concurring) (“The hire for a subscribing independent 
contractor presumably includes the cost of providing workers’ compensation 
coverage related to the work, and the contractor’s employer who pays it should 
have the same protection from extra liability for job-related injuries to the 
contractor’s employees that the contractor has. The employer thus has the same 
economic incentive the contractor has to minimize job-related risks to workers. 
The employer is not like a product manufacturer or other stranger to the work 
relationship who has not born any part of the cost of compensation and therefore 
is not immune from liability for injury to the contractor's employees. Imposing 
liability on the employer for the contractor’s negligent injury of its employee 
is simply inconsistent with the ‘bedrock principle’ that workers’ compensation 
is an employee’s exclusive remedy and full compensation for job-related 
injuries.” (footnotes omitted) (citing Monk v. Virgin Is. Water & 
Power Auth., 53 F.3d 1381, 1392 (3d Cir. 1995); 
Anderson v. Marathon Petrol. Co., 801 F.2d 936, 941 (7th 
Cir. 1986))).

[48] Kroger Co. v. Keng, 23 S.W.3d 347, 349-350 (Tex. 2000) (“The Texas 
Legislature enacted the Act in 1913 in response to the needs of workers, who, 
despite escalating industrial accidents, were increasingly being denied 
recovery. The Act allowed injured workers, whose employers subscribed to 
workers’ compensation insurance, to recover without establishing the employer’s 
fault and without regard to the employee’s negligence. In exchange, the 
employees received a lower, but more certain, recovery than would have been 
possible under the common law.” (citation omitted)); 
Texas Workers’ Compensation Com’n v. Garcia, 
893 S.W.2d 504, 511 (Tex. 1995) (“Employees injured in the course 
and scope of employment could recover compensation without proving fault by the 
employer and without regard to their or their coworkers’ negligence. In 
exchange, the employer’s total liability for an injury was substantially 
limited.” (citation omitted)); Edmunds v. Highrise, 
Inc. 715 S.W.2d 377, 379 (Tex. App.–Houston [1st Dist.] 1986, writ ref’d) (“The theory behind the exclusive remedy provision of 
the Workers’ Compensation Act is that in cases where the employee is merely 
injured, he be given the opportunity to relinquish common law remedies for 
lesser benefits which are paid more quickly and efficiently, and without proof 
of fault.”).

[49] Garcia, 893 S.W.2d at 511; see 
also Kernan v. American Dredging Co., 355 U.S. 426, 431-432 (1958) 
(“[A]s industry and commerce became sufficiently strong to bear the burden, the 
law, the reflection of an evolving public policy, came to favor compensation of 
employees and their dependents for the losses occasioned by the inevitable 
deaths and injuries of industrial employment, thus shifting to industry the 
‘human overhead’ of doing business. For most industries this change has been 
embodied in Workmen's Compensation Acts.”).

[50] Woolsey, 116 
S.W.2d at 676.

[51] See Tex. Gov’t Code § 311.021.

[52] 236 S.W.3d 190 (Tex. 2007).

[53] Id. at 195.

[54] Act approved Mar. 28, 1917, 35th Leg., 
R.S., ch. 103, § 1, Part II, § 6, 1917 Tex. Gen. Laws 
269, 284-285, codified as Tex. Rev. Civ. Stat. Ann. 
art. 8307, § 6, text quoted supra note 40.

[55] Tex. H.B. 1584, 65th Leg., R.S. 
(1977).

[56] As HB 1584 passed the House, it stated: “If 
any subscriber to this law sublets the whole or any part of the work to be 
performed or done by said subscriber to any sub-contractor under a bona fide 
sub-contract made in good faith, then in the event the sub-contractor or any 
employee of such sub-contractor sustains an injury in the course of his 
employment, he shall be deemed to be and taken for all purposes of this law not 
to be the employee of the subscriber. A sub-contractor, as that term is used in 
this Act, means a person, firm or corporation, or any other legal entity 
recognized under Texas law, contracting with the principal or 
prime contractor for the performance, in a capacity other than as an employee, 
of any and all work or services which such principal or prime contractor has 
contracted to perform.”

[57] Tex. H.B. 1585, 65th Leg., R.S. (1977) 
(“(a) As used in this Act, the term sub-contractor means a person, firm, 
corporation or any other legal entity recognized under Texas law, contracting 
with the principal, original or prime contractor for the performance of all or 
any part of the work or services which such principal, original or prime 
contractor has contracted to perform. (b) A sub-contractor and employees of the 
sub-contractor shall be deemed employees of the subscriber for which or for whom 
such sub-contractor is to perform work or services unless: (i) prior to beginning the performance of any work or 
services to be performed under such sub-contract, subscriber and sub-contractor 
have entered into a bona fide written contract expressly providing that 
sub-contractor undertakes such work or services to be performed thereunder as an independent contractor and not as an 
employee of the subscriber; or, (ii) sub-contractor has provided workmen’s 
compensation insurance coverages for sub-contractor’s 
employees and/or the sub-contractor during the performance of the sub-contract 
as evidenced by certificates of insurance issued by sub-contractor’s workmen’s 
compensation insurance carrier.”).

[58] Id. (“(c) Notwithstanding any other 
provisions of this law, a subscriber may provide workmen’s compensation 
insurance coverages for the sub-contractor’s employees 
and/or the sub-contractor. In the event subscriber elects to provide such 
workmen’s compensation insurance coverages, the 
insurance contract specifically shall include such sub-contractor’s employees 
and/or the sub-contractor, and the elected coverages 
shall continue while the subscriber’s policy is in effect and while the named 
sub-contractor is endorsed thereon. The amount of the actual premiums paid or 
incurred by the subscriber for workmen’s compensation insurance coverages on such sub-contractor’s employees and/or the 
sub-contractor shall constitute a legal claim by subscriber against 
sub-contractor and, having provided such workmen’s compensation insurance, 
subscriber may deduct the amount of the actual premiums paid or incurred in 
providing such workmen’s compensation insurance coverages from the sub-contract price or any other monies 
due the sub-contractor.”).

[59] Tex. S.B. 360, 66th Leg., R.S. (1979) (“(a) 
As used in this Act, the term ‘subcontractor’ means a person, firm, corporation, 
or any other legal entity recognized under Texas law, contracting with the 
principal, original, or prime contractor for the performance of all or any part 
of the work or services which such principal, original, or prime contractor has 
contracted to perform. (b) Neither the subcontractor nor the employees of the 
subcontractor shall be deemed employees of the principal, original, or prime 
contractor for whom such subcontractor is to perform work or services unless, 
prior to beginning the performance of any work or services to be performed under 
such subcontract, the subscriber and subcontractor have entered into a bona fide 
written contract expressly providing that the subcontractor or the employees of 
the subcontractor will perform such work or services as employees of the 
subscriber. (c) If no contract is made pursuant to Subsection (b) of this 
section, the original or prime contractor shall provide workers’ compensation 
insurance coverage for the subcontractor’s employees or the subcontractor. The 
amount of the actual premiums paid or incurred by the subscriber for workers’ 
compensation insurance coverage on such subcontractor’s employees or the 
subcontractor may be deducted from the subcontractor’s price or any other money 
due the subcontractor. (d) In lieu of the foregoing, the subcontractor may 
provide workers’ compensation insurance coverages for 
the subcontractor’s employees or the subcontractor during the performance of the 
subcontract as evidenced by certificates of insurance issued by subcontractor’s 
workers’ compensation insurance carrier and filed with the 
subscriber.”).

[60] The committee substitute read:
 
                
    “(a) As used in this Act, the term sub-contractor 
means a person, firm, corporation or any other legal entity recognized under 
Texas law, contracting with the principal, original or prime contractor for the 
performance of all or any part of the work or services which such principal, 
original or prime contractor has contracted to perform.
 
                
    “(b) Neither the sub-contractor nor the employees of 
the subcontractor shall be deemed employees of the principal, original or prime 
contractor for whom such sub-contractor is to perform work or services unless, 
prior to beginning the performance of any work or services to be performed under 
such sub-contract, subscriber and sub-contractor have entered into a bona fide 
written contract expressly providing that the subscriber shall provide workers’ 
compensation benefits to the sub-contractor or the employees of the 
sub-contractor while performing such work or services as if they were direct 
employees of the subscriber. The amount of the actual premiums paid or incurred 
by the subscriber for workers’ compensation insurance coverage on such 
sub-contractor or the employees of the sub-contractor may be deducted from the 
contract price or any other monies due the sub-contractor.
 
                
    “(c) If no contract is made pursuant to subsection (b) 
hereof, neither the sub-contractor nor the employees of the sub-contractor shall 
be deemed employees of the principal, original or prime contractor for whom such 
sub-contractor is to perform work or services.”

[61] Tex. H.B. 1852, 68th Leg., R.S. (1983) 
(“(a) a subcontractor and the employees of a subcontractor shall not be deemed 
to be employees of a prime contractor for whom such subcontractor is to perform 
work or services and there shall be no obligation on the part of a prime 
contractor for the payment to a subcontractor or to the employees of a 
subcontractor of workers’ compensation under this law. A subcontractor and prime 
contractor may include in their written contract for the performance of work or 
services an agreement that the prime contractor will provide workers’ 
compensation benefits to the subcontractor and to employees of the 
subcontractor. The amount of the actual premiums paid or incurred by the prime 
contractor for workers’ compensation insurance coverage for the subcontractor 
and employees of the subcontractor may be deducted from the contract price or 
any other monies owed to the subcontractor by the prime contractor. (b) the term “subcontractor” means a person who has contracted to 
perform all or any part of the work or services which a prime contractor has 
contracted with another party to perform. (c) the term “prime contractor” 
includes “principal contractor” or “original contractor” and means the person 
who has undertaken to procure the performance of work or services and in 
connection therewith may engage subcontractors to perform all or any part of the 
work or services.”).

[62] Tex. Rev. Civ. Stat. 
Ann. art. 8307, § 6(d) 
(“If any subscriber to this law with the purpose and intention of avoiding any 
liability imposed by its terms sublets the whole or any part of the work to be 
performed or done by said subscriber to any sub-contractor, then in the event 
any employe of such sub-contractor sustains an injury 
in the course of his employment he shall be deemed to be and taken for all 
purposes of this law to be the employe of the 
subscriber, and in addition thereto such employe shall 
have an independent right of action against such sub-contractor, which shall in 
no way be affected by any compensation to be received by him under the 
provisions of this law.”).

[63] Id. § 6(a) (“A subcontractor and 
prime contractor may make a written contract whereby the prime contractor will 
provide workers’ compensation benefits to the sub-contractor and to employees of 
the sub-contractor. Notwithstanding the provisions of Section 12(g), Article 
8306, Revised Statutes, the contract may provide that the actual premiums (based 
on payroll) paid or incurred by the prime contractor for workers’ compensation 
insurance coverage for the sub-contractor and employees of the sub-contractor 
may be deducted from the contract price or any other monies owed to the 
sub-contractor by the prime contractor. In any such contract, the sub-contractor 
and his employees shall be considered employees of the prime contractor only for 
purposes of the workers’ compensation laws of this state (Article 8306, Revised 
Statutes, et seq.) and for no other purpose.”).

[64] Id. § 6(c).

[65] Id. § 6(b).

[66] We have been cited only two cases that have 
considered whether a jobsite owner can be the statutory employer of 
subcontractors and their employees. One answered no, but only in dicta, 
Williams v. Brown & Root, Inc., 947 S.W.2d 673, 677 (Tex. 
App.–Texarkana 1997, no writ), and the Court’s opinion explains why it is not 
persuasive. The other also answered no, but involved a prior version of the 
statute at issue. Wilkerson v. Monsanto Co., 782 F. 
Supp. 1187 (E.D. Tex. 1991).

[67] Tex. H.B. 2279, 74th Leg., R.S. (1995); 
Tex. H.B. 2630, 75th Leg., R.S. (1997); Tex. H.B. 3024, 75th Leg., R.S. (1997); 
Tex. S.B. 1404, 76th Leg., R.S. (1999); Tex. H.B. 3120, 77th Leg., R.S. (2001); 
Tex. H.B. 3459, 77th Leg., R.S. (2001); Tex. H.B. 2982, 78th Leg., R.S. (2003); 
Tex. S.B. 675, 78th Leg., R.S. (2003); Tex. H.B. 1626, 79th Leg., R.S. 
(2005).

[68] See Tex. Gov’t Code § 311.021 (“In enacting 
a statute, it is presumed that . . . (3) a just and reasonable result is 
intended . . . .”).